**Cecil BOYD et al.**

**v.**

**William W. GULLETT et al.**

**Civ. No. 72–1278–Y.**

United States District Court,
D. Maryland.

Aug. 2, 1974.

Allen R. Snyder, John M. Ferren, Washington, D. C., Jack Greenberg, New York City, Harold Buchman, Baltimore, Md., Norris C. Ramsey, Glen Burnie, Md., Ralph J. Temple, Washington, D. C., Alan J. Goldstein, College Park, Md., Eric S. Sirulnick, Washington, D. C., for plaintiffs.

Joseph S. Casula, Glenn T. Harrell, Jr., Virginia S. Criste, Upper Marlboro, Md., for defendants.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

Nine black citizens of Prince George's County, Maryland, and the Prince George's County Chapter of the National Association for the Advancement of Col-ored People (NAACP) allege a violation of certain constitutional rights resulting from a systematic pattern of police brutality aimed at black people in Prince George's County. The individual plaintiffs all claim to be the victims of individual acts of police brutality. The NAACP is suing on behalf of its members which it alleges are subject to the police brutality. The defendants fall into three categories: (1) certain public officials of Prince George's County who are allegedly in a position to put an end to the illegal acts, specifically William Gullett, the County Executive, Roland Sweitzer, the Chief of the Prince George's County Police Department, John Rhodes, the Deputy Chief of Police, Captain Rice Turner, the Chief of the Internal Affairs Division, Ralph Kalmus, Chief of the Community Relations Division, and Dewey Lomax, Chairman of the County Human Relations Commission; (2) 14 named police officers accused of specific acts of brutality against the nine individual plaintiffs; and (3) 21 John Doe defendants, unidentified police officers who participated with the 14 named defendants in acts of brutality aimed at the individual plaintiffs. The latter two groups are joined individually and as representatives of the class of officers of the Prince George's County Police Department engaging in such activities.

The plaintiffs have brought this action under 42 U.S.C. §§ 1981, 1983, 1986 and 1988, seeking both declaratory and injunctive relief to force the supervisory personnel to establish effective rules and procedures to prevent police brutality and to force the police officers in the latter two groups to refrain from further illegal acts.

The defendants have filed motions to dismiss the NAACP as a plaintiff for lack of standing, to dismiss the supervisory officers as defendants on grounds of sovereign immunity and to dismiss the John Doe defendants because of inadequate identification. The defendants

have filed an additional motion for a protective order to prevent discovery of police investigative files. The motions will be dealt with *seriatim*.

### 1. *Motion to Dismiss NAACP*

In support of their motion, defendants rely on Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), in which the Supreme Court dismissed the Sierra Club as plaintiff for lack of standing. This Court followed Sierra Club v. Morton, *supra*, in dismissing the American Civil Liberties Union of Maryland from a suit brought to enjoin the payment of funds to church affiliated colleges and universities under a state aid program. *See* ACLU v. Board of Public Works of Maryland, Civ.No. 72–307 , (D.Md.1972). However, neither *Sierra Club* nor *ACLU* is applicable in the instant case.

In *Sierra Club*, the plaintiff was attempting to pioneer a new test of standing for public interest organizations. The Club maintained that its bona fide, long-term commitment to the cause of conservation should entitle it to challenge a proposed development in a wilderness area in California for which government permits and rights of way were necessary. The Supreme Court ruled that despite the recent broadening of the standing concept in Associated Data Processing Services v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), an allegation of some injury in fact to the organization or its members was nevertheless necessary to establish standing. The Court suggested that Sierra Club start over and amend its complaint to allege injury. Similarly, in *ACLU* there was no allegation of injury to the membership or to the organization, but instead a reliance on vigorous advocacy of the separation of church and state to establish standing. A history of such advocacy clearly did not meet the standard set by *Sierra Club* and therefore failed to establish standing.

In contrast to the Sierra Club and the ACLU, the NAACP here makes numerous allegations that a pattern of police harassment is aimed at its membership as well as at black citizens of Prince George's County generally. United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), holds that such allegations are sufficient to establish standing, shedding light on the injury in fact criteria of *Sierra Club*. The Supreme Court held that an allegation of even slight injury spread widely throughout the society would be sufficient to establish standing. SCRAP, an unincorporated association of five law students at George Washington University Law School, and the Environmental Defense Fund petitioned to enjoin the ICC from permitting a rate increase which would discriminate against the transportation of recycled materials in favor of virgin raw materials. SCRAP alleged that

> \* \* \* each of its members was caused to pay more for finished products, that each of its members "uses the forests, rivers, streams, mountains and other natural resources surrounding the Washington Metropolitan area [for] \* \* \* recreational [and] aesthetic purposes," and that these uses have been adversely affected by the increased freight rates, that each of its members breathes the air within the Washington metropolitan area and \* \* \* this air has suffered increased pollution caused by the modified rate structure, and that each member has been forced to pay increased taxes because of the sum which must be expended to dispose of otherwise reusable waste materials.

*Id.* at 678, 93 S.Ct. at 2411. These allegations were held to be sufficient to establish both injury in fact and standing. Clearly, minimal allegations of injury in fact are sufficient to maintain standing.

Historically the NAACP has fared well in the Supreme Court on standing issues in cases similar to this. The Association has successfully represented the interests of its membership on numerous occasions, particularly where an element of intimidation or coercion existed, *see* Louisiana *ex rel.* Gremillion v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1962); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1959); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1957), or where the NAACP was peculiarly well placed to maintain the action, *see* NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1962); *cf.* Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1919). The NAACP is well placed to maintain this action on behalf of its membership and black citizens of the County generally, and meets the minimal requirements of injury in fact required by U. S. v. SCRAP, *supra.* Defendants' motion must be denied.

### 2. *Immunity*

Defendants contend that the supervisory officials in the first group of defendants should be dismissed on the grounds of sovereign immunity. The thrust of their argument is that no relief can be granted against such officials absent a showing of personal knowledge or involvement in the alleged unconstitutional activities. The complaint is claimed to be defective because it only alleges that defendants "knew or should have known" of the constitutional violations.

A motion to dismiss must be construed favorably to the pleader. The test to be applied is that " * * * a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45, 78 S. Ct. 99, 102, 2 L.Ed.2d 80 (1957). If the plaintiffs prove that the supervisory defendants knew of the illegal activities and either encouraged them or took no steps to prevent them, such proof would certainly justify the relief requested in this case. *See* Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Lewis v. Kugler, 446 F.2d 1343 (3d Cir. 1971); Schnell v. City of Chicago, 407 F.2d 1084 (7th Cir. 1969); Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966) (Sobeloff, J.); Wheeler v. Goodman, 298 F.Supp. 935 (N.C.1969). Accordingly, defendants' motion to dismiss must be denied.

This ruling is not to be interpreted as agreement with defendants' position that actual notice of constitutional violations must be proven to establish liability. *Compare* Lankford v. Gelston, *supra,* 364 F.2d at 205 n. 9 and Lewis v. Kugler, *supra,* 446 F.2d at 1351 *with* Schnell v. City of Chicago, *supra,* 407 F.2d at 1086. The Court will reserve judgment on this point for a more appropriate occasion in the proceedings.

### 3. *John Doe Defendants*

The defendants claim that the John Doe defendants should be dismissed because they have not been sufficiently identified. This motion is also denied.

It is not essential in this case that the John Does be identified by name since personal liability is not at issue. Injunctive relief, if granted, would act against all members of the Prince George's County Police Department, including all John Doe defendants still members of the department, to prevent them from violating petitioners' rights. Thus, even if the John Doe defendants ultimately should prove unidentifiable there would be no need to dismiss them from this case. *See* Schnell v. City of Chicago, *supra.*

In any event, dismissal of these defendants would be particularly inappropriate at this point because of the likelihood that their identities will be established in the course of discovery.

### 4. *Discovery*

The defendants have requested a protective order to prevent discovery of investigative files, complaints, records and reports relating to the alleged incidents and similar incidents of police brutality which are in the possession of the County Police Department and the Human Relations Commission on the grounds that such files are privileged under Maryland law.

■ Rule 26(b)(1) of the Federal Rules of Civil Procedure reads as follows: "Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action, \* \* \*." (Emphasis supplied.) Although the rules do not define *privileged* for the purposes of Rule 26(b)(1), courts have generally understood the term to refer to those evidentiary privileges applicable in a trial proceeding. *See* Reynolds v. United States, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). Thus, information which would be inadmissible at trial because of an evidentiary privilege, would not be available in the course of discovery.

■ Federal Rules of Civil Procedure, Rule 43(a), sets forth the criteria governing the admissibility of evidence: "All evidence shall be admitted which is admissible under the statutes of the United States or under the rules of evidence heretofore applied in the courts of the United States on the hearings of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction in the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs." The policy of the rule is to facilitate the admission of evidence by permitting a judge to look to the most liberal of three possible sources of law on admissibility. The unequivocal language of the Rule precludes the application of a state granted privilege, specially in federal question cases, where a less restrictive rule is available. However, state privileges generally are created in order to protect or enhance social relationships which the state deems important. A number of courts have applied state privileges to protect the favored relationship in federal question cases, even when less restrictive alternatives were available.

The defendants rely on Baird v. Koerner, 279 F.2d 623 (9th Cir. 1960), and a number of cases which have followed *Baird,* most notably Love v. United States, 386 F.2d 260 (8th Cir. 1967), for the proposition that federal courts should follow state rules of privilege in federal question cases.

The issue in *Baird* was whether the California statute which codified the common law attorney-client privilege should apply in federal court. In examining the three sources of law specified by Rule 43, the Ninth Circuit noted (1) that federal case law was unclear on the privilege, (2) that federal equity courts had applied state law on attorney-client privilege, and (3) that California statute recognized the privilege. Thus, Rule 43 did not prevent a federal court from recognizing the privilege. The court also pointed out that federal courts have traditionally applied state laws establishing the qualifications in admitting attorneys to practice before federal courts. Therefore, state laws regulating the legal practice, such as attorney-client privileges, should also apply. The court held that general public policy considerations favored the granting of the privilege with a general balancing of policy considerations in each case necessary in determining the application of a privilege. California's strong policy in favor of this privilege was found to outweigh the federal interest in full disclosure in civil proceedings. *See also* Love v. United States, 386 F.2d 260 (8th Cir. 1967), *cert. denied,* 390 U.S. 985, 88 S.Ct. 1111, 19 L.Ed.2d 1286 (1968); Garrison v. General Motors Corp., 213 F.Supp. 515 (S.D.Cal.1963);

United States v. Becton Dickinson and Co., 212 F.Supp. 92 (D.C.N.J.1962); Spray Products Corp. v. Strouse, Inc., 31 F.R.D. 244 (D.C.Pa.1962); Leonia Amusement Corp. v. Loew's, Inc., 13 F.R.D. 438 (S.D.N.Y.1952). Although *Baird* gave the state privilege greater weight than most cases, it does not require the application of state privileges in all federal question cases.

Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970), presents a more reasonable approach to the question. *Garner* held that federal law should apply in federal question cases because such cases, dealing with important federal policies, should not turn on state evidentiary rules. However, the court went on to say that state policies, as represented by state evidentiary privileges, must be given some consideration. Accordingly, a federal court might defer to state law where an especially strong state policy is involved.

The *Garner* approach has generally found approval. *See* Wright & Miller, 9 Federal Practice and Procedure, § 2408, suggesting that the law is clear that federal law should be applied in federal question cases. *See, e. g.,* Colton v. United States, 306 F.2d 633 (2d Cir. 1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *In re* Albert Lindley Lee Memorial Hospital, 209 F.2d 122 (2d Cir. 1953), *cert. denied sub nom.* Cincotta v. United States, 347 U.S. 960, 74 S.Ct. 709, 98 L.Ed. 1104 (1954); Falsone v. United States, 205 F.2d 734 (5th Cir. 1953).

The law is unclear as to private federal question litigation because of the dearth of reported cases on the issue. However, Wright notes that states should not be permitted to say that useful evidence should not be heard in a federal question case. *See also* Barron and Holtzoff, 2B Federal Practice and Procedures, § 967 (Wright, ed.), where the authors suggest that federal courts have not recognized novel state privileges created by state statutes or state

extensions of traditional privileges. *See* Garner v. Wolfinbarger, *supra* (rejection of extension of attorney-client privilege); In re Albert Lindley Lee Memorial Hospital, *supra* (rejection of doctor-patient privilege); United States v. Brunner, 200 F.2d 276 (6th Cir. 1952) (rejection of husband-wife privilege); Mariner v. Great Lakes Dredge & Dock Co., 202 F.Supp. 430 (N.D.Ohio 1962) (court reserves right to restrict extent of a state privilege statute). It is noteworthy that the cases which have followed *Baird* have dealt with application of the traditional attorney-client privilege.

The Court also notes that Rule 501 of the Proposed Federal Rules of Evidence severely restricts the application of privileges. The 1973 Advisory Committee Note rejects the notion that federal question cases should be subject to state evidentiary privileges.

Both the law and logic require the application of federal law in this case unless it can be shown that the State of Maryland has a strong public policy in favor of a privilege for investigative files. However, far from having a strong policy in favor of such a privilege, it appears that the state has no such policy at all.

Defendants cite Whittle v. Munshower, 221 Md. 258, 155 A.2d 670 (1959), as creating a Maryland privilege for police investigative agencies to withhold investigative reports. That case involved a petition for a writ of mandamus against the Maryland State Police to release information in investigative reports which would show that decedent had been unfairly accused of making a "defective piece of material." The decedent's representatives were not engaged in any legal action for which this information might be necessary, but were only concerned with protecting the decedent's reputation. The court, ruling that the State Police were under no general legal duty to make investigative reports available to the petitioners or to the public,

and accordingly were not subject to mandamus, decided this case on the basis of mandamus principles rather than privilege.

An opinion of the Attorney General of Maryland in 1945 lends small support to defendants' position. *See* 30 Op.Att'y Gen. 125 (September 13, 1945). In answer to a question from the Director of the State Industrial Accident Commission, the Attorney General stated that there was little, if any, Maryland law on the discoverability of confidential reports in the possession of state administrative agencies. The Attorney General cited Wigmore on Evidence (3d ed.) § 2377, for the general proposition that where governmental access to necessary information might be jeopardized by public disclosure, a privilege should be recognized. The Attorney General suggested that the Commission issue rules in conformity with Wigmore's view, but expressed no opinion as to the effect of such rules on discovery in civil litigation. Indeed, the opinion states: "This of course is not the same thing as to say that such information could not be compelled to be disclosed in a judicial proceeding." *Id.* at 126.

A further opinion of the Attorney General in 1955 advised the Police Commissioner of Baltimore City that he need not release details of an ongoing criminal investigation to members of the press. However, such information could certainly be released in the course of discovery. *See* 40 Op.Att'y Gen. 396 (November 4, 1955).

■■ It is apparent that no privilege exists for investigatory files under the case law of Maryland. The Maryland approach to discovery is generally similar to the federal approach. Liberal discovery is encouraged so that parties may have ample opportunity to prepare their cases. *See* Baltimore Transit Co. v. Mezzanotti, 227 Md. 8, 174 A.2d 768 (1961). The trial judge may exercise reasonable, sound discretion in applying the discovery rules, *Id.* at 14, 174 A.2d

768, and presumably would exercise such discretion where appropriate to prevent harm to the public interest in the course of discovery. Such discretion does not amount to a privilege or a sufficiently strong state policy to warrant recognition in a federal court.

Defendant's remaining argument rests on a strained interpretation of Article 76A, § 3(b)(i) and 3(c)(iii) of the Annotated Code of Maryland, and equivalent sections of the Prince George's County Code and the Prince George's County Merit Ordinances. The two sections read as follows:

3(b). The custodian may deny the right of inspection of the following records, unless otherwise provided by law, on the ground that disclosure to the applicant would be contrary to the public interest;

* * * (i) Records of investigations conducted by * * * any sheriff, county attorney, city attorney, the Attorney General, police department or any investigatory files compiled for any other law enforcement or prosecution purposes; * * *

3(c). The custodian shall deny the right of inspection of the following records, unless otherwise provided by law: * * * (iii) Personnel files * * *.

The defendants maintain that these sections create a privilege on behalf of police and county officials as to investigatory records and as to personnel files.

■■ The plaintiffs argue that the phrases "unless otherwise provided by law" appearing in these sections indicate that such material is subject to judicial discovery even though it is otherwise privileged. There is no relevant Maryland case law on this subject, but as the statute is similar to the federal Freedom of Information Act, 5 U.S.C. § 552, the Court will look to interpretation of the federal law for guidance.

The case most clearly in point is Verrazzano Trading Corp. v. United States,

349 F.Supp. 1401 (Cust.Ct.N.Y.1972), where the court ordered the Bureau of Customs to produce for copying various technical reports and files relating to the composition of certain fabrics. The court held that the Bureau could not use the exceptions to the federal Freedom of Information Act as a shield to discovery. "It was not enacted to provide discovery procedures for obtaining information during litigation * * * the fact that § 552(b) of the Information Act provides specified exemptions from the Act's public information requirements does not in and of itself create a judicial discovery privilege * * *." *Id.* at 1403.

*Verrazzano* is supported by 4 Moore's Federal Practice § 26.61 [4.–3] at 26–278, which states that the phrase "otherwise available by law" which appears in the federal Act's exemption relating to law enforcement investigative materials refers to the discovery procedures of the Federal Rules of Civil Procedure since judicial discovery is the only way in which such materials are in fact "otherwise available by law." Thus, despite the Freedom of Information Act exemptions, the scope of discovery remains unchanged by the Act. *Cf.* General Services Administration v. Benson, 415 F.2d 878 (9th Cir. 1969).

The defendants rely on two cases to establish that the Act does create a judicial privilege. Both of these cases are distinguishable from the *Boyd* situation.

In International Paper Co. v. Federal Power Com'n, 438 F.2d 1349 (2d Cir. 1971), the court affirmed the FPC's refusal to produce staff memoranda and notes which went into the preparation of four prior FPC decisions. However, the FPC's refusal came about during the course of an administrative proceeding rather than a judicial one. The plaintiff resorted to the Freedom of Information Act because the Federal Rules of Civil Procedure were not available to it. The court held that the language of the exemption relied upon by the agency, §

552(b)(5), subjected the agency to the same standards as would be applicable in civil litigation under the Federal Rules. As agency memoranda preparatory to an agency opinion are traditionally privileged in ordinary civil litigation to protect the deliberative process, the agency's refusal was justified. Since this case involves discovery in an administrative proceeding and since the material requested would have been privileged in any event in a judicial action, the case lends little support to defendants' position.

Cowles Communications, Inc. v. Department of Justice, 325 F.Supp. 726 (N.D.Cal.1971), represents a peculiar factual situation. Cowles was sued by the Mayor of San Francisco for libel. During the libel trial, Cowles attempted to subpoena records of the Immigration and Naturalization Service relating to a particular investigation. The Service refused to produce the documents on the advice of the Attorney General. The first libel trial ended and Cowles filed suit for production of the documents under the Freedom of Information Act in anticipation of a new trial. The court ruled that the documents fell within an exemption of the statute. The basis of decision, therefore, was not that the documents were privileged from discovery in a judicial proceeding, but that this class of documents was privileged in a *non-judicial* resort to the statute. Defendants offer no other authority for their position.

■ Although the authority for plaintiffs' argument is somewhat sparse, their position is more consistent with the spirit of freedom of information acts generally. The intention of Congress and presumably the Maryland Legislature was to increase public access to government information. Both acts provide that "any person" has the right to non-exempt materials, and the exemptions are merely reasonable limitations on this broad right of "any person" to request information. It would not be

reasonable to view such acts as creating new privileges where privileges never existed. Indeed, such an interpretation would result in a restriction of public access to government information. Such a paradoxical result could not have been intended by the Maryland Legislature by its passage of Article 76A, and the Court is satisfied that the exemptions in the statute do not create privileges for the purposes of discovery.

 There is therefore no obstacle to the application of the federal law of discovery in this case. Under federal law there is no privilege for police investigative files other than to files relating to ongoing investigations. *See* Swanner v. United States, 406 F.2d 716 (5th Cir. 1969); Dubose v. Mayberry, No. 72–690 (W.D.Okl., March 29, 1973); Wood v. Breier, 54 F.R.D. 7 (E.D. Wis.1972); Carter v. Carlson, 56 F. R.D. 9 (D.D.C.1972); Alexander v. Rizzo, 50 F.R.D. 374 (E.D.Pa.1970); Capitol Vending Co. v. Baker, 35 F.R.D. 510 (D.D.C.1964); *Cf.* Mackey v. United States, 122 U.S.App.D.C. 97, 351 F.2d 794 (1964); Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 280 F.2d 654 (1960).

Wood v. Breier, *supra*, is illustrative of the approach taken in the majority of cases. *Wood* was brought under 42 U. S.C. § 1983 against the Milwaukee police department for monetary relief against police officers for an alleged act of brutality and for equitable and monetary relief against the deliberate concealment of the identity of the culpable police officers by supervisory officials. The court reviewed the materials *in camera* to screen materials of a non-factual nature, such as official criticisms and recommendations of · action, but ordered production of the great bulk of the documents. The court stated that a protective order in such a case would be appropriate only in the most compelling of circumstances because it would be in conflict with two major federal policies, *i. e.*, the vigorous enforcement of the

civil rights statutes and the broadest possible scope of discovery in civil litigation.

Defendants cite Brown v. Thompson, 430 F.2d 1214 (5th Cir. 1970), and Kott v. Perini, 283 F.Supp. 1 (N.D.Ohio 1968), as recognizing a federal privilege in such cases. However, *Brown* was concerned with discovery of the files of an *ongoing* police homicide investigation. Materials relating to ongoing investigations are indeed privileged although they cease to be privileged once the investigation ceases. *See* Swanner v. United States, *supra*; Wood v. Breier, *supra* at n.18 (summary of authority).

Kott v. Perini, *supra*, in reliance on United States v. Mackey, 36 F.R.D. 431 (D.D.C.1965), held that all police records are undiscoverable for reasons of public policy, although the court did not indicate what specific public policy was served by such a rule. As the opinion in *Mackey*, upon which the court relied in *Kott*, was overruled on exactly this point four years prior to the *Kott* opinion, *see* Mackey v. United States, *supra*, *Kott* cannot now be said to be persuasive.

 Although no general privilege against discovery of police files exists, certain restrictions on discovery would be appropriate. Thus investigatory, files relating to investigations currently in progress may properly be withheld. The names of informers, if any, may be deleted from records subject to discovery. Material of a non-factual nature, *i. e.*, official criticisms, recommendations of action, policy recommendations or opinions of supervisory personnel may be submitted to the court for *in camera* review. Although the latter materials could well be relevant to the plaintiffs' case, some supervision of discovery may be necessary to protect the decision making process in the various government agencies involved in this case. Because of the delicate information which may appear in the discovered materials, only the plaintiffs' attorneys of record and designated para-legals and law students

may see and consider any items discovered as a result of this opinion.

Counsel for plaintiffs will prepare an order in accordance with the findings set forth herein.